208 So.2d 158 (1968)
Nathaniel HAMILTON
v.
NEW AMSTERDAM CASUALTY COMPANY.
No. 2947.
Court of Appeal of Louisiana, Fourth Circuit.
March 4, 1968.
*159 Edmond R. Eberle, New Orleans, for plaintiff, appellant-appellee.
Lemle & Kelleher, H. Martin Hunley, Jr., New Orleans, for defendant-appellant.
Before BARNETTE, JOHNSON and TUCKER, JJ.
TUCKER, Judge.
This is a workmen's compensation suit in which plaintiff was awarded $10.00 a week for 150 weeks for a partial disability of the hand plus statutory penalties and $400.00 attorney's fees. Both plaintiff and defendant compensation insurer have appealed. On appeal, plaintiff prays for $35.00 a week for 400 weeks for permanent and total disability and an increase in the attorney's fees. On the other hand, defendant contends on appeal that plaintiff should undergo an operation amputating the distal phalange of his right index finger (the first joint) before compensation payments resume and asks for a reversal of the award for penalties and attorney's fees.
Plaintiff was injured on August 4, 1966 when he dropped a metal pipe on his right index finger while working for Tex-Dex Inc. in New Orleans, Louisiana. His duties at Tex-Dex included pouring concrete and cleaning up the yard by stacking lumber and various steel objects. At first plaintiff did not believe his injury required medical attention but on August 8, 1966 the pain in his finger had become so intense that his employer sent him to Dr. Francis J. Nicolle who administered antibiotics, suggested soaking the finger, and made an incision so that it could drain.
Dr. Nicolle's diagnosis was that plaintiff had an abscess of the tip of the finger with the loss of fatty tissue at the site of the injury. He further testified plaintiff had tenderness at the tip of the finger and when he examined him at the time of trial, he was of the opinion that plaintiff's condition had not improved nor was it likely to improve. Dr. Nicolle gave the following description of plaintiff's present condition: "I still say he has a very tender finger and some difficulty in the use of it." However, Dr. Nicolle's report which was sent to defendant stated plaintiff was able to resume work on September 7, 1966 and was discharged by him September 27, 1966. Defendant discontinued compensation payments September 6, 1966.
On September 7, 1966 plaintiff attempted to return to work but the incision reopened and he was only able to work a few hours. After his discharge by Dr. Nicolle, he also attempted to return to work but was told that his job had been filled. On October 24, 1966 plaintiff consulted Dr. Nick J. Accardo, an orthopedic specialist, who recommended in his report that plaintiff have an operation to amputate the distal phalange of his right index finger. Plaintiff has consistently refused to undergo this operation.
On November 15, 1966 plaintiff went to work at Canada Dry Bottling Company as a truck loader. He said he had difficulty loading the trucks and frequently dropped *160 the cases, but that he took the job because of economic necessity. He further testified that his fellow workers "favored" him and frequently let him operate a fork-lift truck instead of doing the loading work. This testimony was corroborated by Edward Morris, a fellow worker at the Canada Dry Bottling Company, who also testified plaintiff complained of pain in his finger. Plaintiff was discharged from the Canada Dry Bottling Company on December 28, 1966 for not reporting on a work day. Since that time he has not sought other employment because he says his finger bothers him too much to do work in which he has to use his hands.
On February 22, 1967 the defendant's adjuster received a report from Dr. Accardo which said in part:
"In response to your first question; namely one, `Please advise if in your opinion, in the claimant's present condition, he could do this type work which is work of a general unskilled laborer.' My answer is, `Of course, he could do it, but it would be with great pain and difficulty and under a handcap.'"
In spite of this report defendant did not resume compensation payments.
With respect to the instant case we must consider four questions: (1) What is the extent of plaintiff's disability? (2) Should an operation be ordered under penalty of plaintiff's forfeiting his compensation? (3) If so, should compensation payments nevertheless be brought up to date? (4) Should penalties and attorney's fees be assessed?
With regard to the first question, i. e., the extent of plaintiff's disability, Dr. Accardo described the injury as follows: a severe soft tissue injury of the distal phalange of the right index finger, also involving a traumatic bone injury and acute tenderness and deformity. He reiterated at the trial that plaintiff could only do the work of a common laborer with great pain and difficulty, and under a handicap.
The trial judge based his award of partial disability on the statement of Dr. Accardo that plaintiff would have a 10% disability of the hand after the operation. However, this percentage of disability is not determinative of plaintiff's present condition. Even if a percentage of disability could be determined with regard to plaintiff's present injury, it would not alter the fact that he can only perform the duties of a common laborer with great pain. It has been held that when a worker cannot perform the substantial duties of his former occupation or can only perform them in substantial pain, such a worker is totally and permanently disabled for workmen's compensation purposes irrespective of the medical percentage of the loss of use of the affected member. McGee v. Reimers-Schneider Co., La.App., 102 So.2d 566, and the cases cited therein. The same result was reached in Lavergne v. Southern Farm Bureau Casualty Insurance Co., La.App., 171 So.2d 751, where the compensation claimant had only an 8% partial disability of the hand. Therefore, we conclude that plaintiff is presently totally and permanently disabled.
With regard to the second question, i. e., whether or not plaintiff should be required to undergo the operation under penalty of forfeiting his compensation payments, three tests have been applied to determine whether an employee is justified in refusing to submit to an operation: (1) can the operation reasonably be expected to relieve the disability; (2) will it cause the claimant a minimum of danger to his life and a minimum of pain; (3) is there substantial agreement among all medical witnesses as to the necessity of the operation and the probability the disability will be cured without recurrence. Duplechien v. States Exploration Company, La.App., 94 S.2d 460 and Borders v. Lumbermens Mutual Casualty Co., La.App., 90 So.2d 409.
Concerning the first test, Dr. Accardo testified that he recommended the operation and felt that it would be successful as it *161 would in all probability enable plaintiff to do the things he is unable to do now. Although he said that there was a possibility of "phantom pain" which some people experience after an amputation, he could remove all objective reasons for the pain.
Regarding the second test, Dr. Accardo classified the operation as a major one largely because he felt it should be done under a general anesthetic. Regarding the risk, he stated the following:
"Well, first of all, to be realistic about it, if the risks were enormous, I for one wouldn't make the recommendation. I mean, the risks are practical in that they are safe. Of course, the question arises: What are the risks; what are the absolute possibilities. And under the thought that this is a practical operation to recommend, that the risks, normally are not practical enough to warrant not doing the operation, I would say that the possible complications are in the area of anesthesia; however, in the area of anesthesia, a patient who is properly admitted into a hospital, say in a proper period of time so he could be properly worked up and have proper analyses made of his chemistry, cardiac evaluation, proper evaluation of his kidneys and his lungs, and if all of these things are negative, then the possibilities become more and more remote that he wouldn't have anything to worry about. The probabilities of a complication from anesthesia in a hospital such as I work in where physicians, anesthetist gives the anesthesia and supervises the anesthesia, the possibility of complications are again remote and are not of a major concern. Yet, they are of concern, also, for all good doctors to make these preparations and evaluations preoperatively. If a patient checks out preoperatively under a good anesthesiologist, I don't think the risks are anywhere near being concerned about doing the operation.

* * * * * *
"Any anesthetic, that's Number One, from the anesthesia side; the risk of that is on the length of time of surgery. In an amputation, it takes only a matter of a moment to do the distal end of the phalange and the risk is very small. Now, the risk from surgery, itself, risk, you would have no risk as far as hemorrhage at the distal end of the finger; you wouldn't have any problem there. There's always a risk in surgery of infection. No doctor leaves an operating room with a certificate stating that one wouldn't have an infection. It's a risk, but a very minor risk * * *." (Emphasis added).
An analysis of the above testimony indicates that the general anesthetic is the major problem and but for that, this would be a relatively minor operation. It has been held that the risk of danger through the use of a general anesthetic is not so substantial as to excuse a claimant's refusal to undergo surgery. Duplechien v. States Exploration Company, supra. In the cited case the claimant was ordered to submit to surgery to have a portion of the bone of his right forearm removed. In Fredieu v. Mansfield Hardwood Lumber Co., La.App., 53 So.2d 170, an operation to remove a knee ligament was ordered even though it required a general anesthetic. In both of these cases the court-approved operations were obviously more serious that that involved in the instant case.
Operations on fingers have been ordered in Leday v. Lake Charles Pipe & Supply Co., La.App., 185 So. 655 and Skidmore v. Drumon Fine Foods, Inc., La.App., 119 So. 2d 523. In the Leday case the amputation of the first phalange of plaintiff's left finger left the finger tender and sore and the court found the plaintiff had to submit to the amputation of another phalange or lose compensation. In the Skidmore case a nueroma (tumor) was ordered removed at the site of the amputation of a portion of the finger in spite of the testimony of one physician that the nature of the complaint *162 was causalgia (neuralgia) which may have been aggravated by the proposed operation. In the instant case there is no disagreement among physicians as to the necessity of the operation as only Dr. Accardo testified concerning it, thus fulfilling the third test.
Under all the circumstances we find plaintiff should be ordered to undergo the operation or forfeit compensation after a period of time set out below. Because only the tip of his index finger is involved, if we do not order this operation, it is difficult to envision a situation in which an operation should be ordered.
With regard to the third question, i. e., whether or not plaintiff's compensation payments should be brought up to date, it has been held that the employer and insurer must continue to pay compensation even though plaintiff refuses to submit to an operation until the claimant has had his day in court, including appellate review, to test the reasonableness of his grounds for refusal. This is true even though an operation may ultimately be ordered. Sumrall v. J. C. Penney Company, La.App., 101 So.2d 758, affirmed 239 La. 762, 120 So.2d 67; Duplechien v. States Exploration Company, supra; Abshire v. Hartford Accident and Indemnity Co., La.App., 179 So.2d 508.
Regarding penalties and attorney's fees it has also been held even though an insurer may have cause to believe that a workman's disability may be removed by surgery, the insurer cannot ex parte terminate the payment of compensation upon the refusal of the workman to submit to surgery and if the insurer does so, discontinuance will be deemed arbitrary and capricious and without probable cause so as to entitle the workman to statutory penalties and attorney's fees. Sumrall v. J. C. Penney Co., supra. This is true even though, as in the instant case, the operation is ultimately ordered. See Abshire v. Hartford Accident and Indemnity Co., supra. In the instant case, however, we are confronted by the question as to the date from which the penalties should be assessed because it cannot be said that the insurer was arbitrary and capricious during the entire period when payments were suspended. First, the insurer relied on Dr. Nicolle's report that plaintiff could return to work on September 7, 1966 and later through investigation, it discovered plaintiff was employed as a truck loader at the Canada Dry Bottling Company. However, on February 22, 1967 it received Dr. Accardo's report that plaintiff could only perform the work of an unskilled worker with great pain and difficulty. We find that it was at this time that the insurance company's refusal to resume payments became arbitrary and capricious under LSA-R.S. 22:658 so as to subject it to penalties.
The trial judge allowed attorney's fees of only $400.00, a figure which is grossly inadequate. Our jurisprudence has fixed attorney's fees in similar cases in amounts varying from $1,500.00 to $3,000.00. McClelland v. Liberty Mutual Insurance Co., La.App., 180 So.2d 19 and the cases cited therein. Under all the circumstances prevalent here, we find that an attorney's fee of $1,500.00 is fair and adequate. See Patin v. Coal Operators Casualty Company, La. App., 173 So.2d 281 and Doucet v. Travelers Insurance Company, La.App., 149 So.2d 448.
For the above reasons the judgment is amended to award plaintiff $35.00 a week for a period not exceeding 400 weeks beginning August 4, 1966 (subject to credit for compensation already paid). Penalties of 12% are assessed on any payment overdue more than 60 days from February 22, 1967 or for any future payments which may become overdue for more than 60 days. The award for attorney's fees is increased from $400.00 to $1,500.00.
It is also ordered that plaintiff's right to receive compensation payments beyond those due up to 30 days from the date of the finality of this judgment is conditioned on his submission to the operation above described by a surgeon of his own selection *163 at the exclusive cost of defendant; on his refusal to submit to an operation within that time plaintiff's right to receive further compensation as the result of the injury forming the basis of the present suit shall cease; provided further that any time after said operation has been performed, the defendant is given the right to show by reason thereof that compensation payments should either be diminished or should cease; defendant to pay all costs of this appeal.
Judgment amended in part and reversed in part.