CUTRER, Judge ad hoc.
This suit was filed by William Adams for workmen’s compensation benefits against his employer Ovide LaCour and/or Ó. B. LaCour d/b/a O. B. LaCour Plantation and its compensation carrier St. Paul Fire and Marine Insurance Company. The lower court rendered judgment in favor of petitioner for 28 weeks of temporary total disability recognizing that this had been previously paid by defendants, plus an award for permanent partial disability of the body as a whole for 472 weeks payable at the rate of $12.50 per week. Plaintiff appealed seeking compensation for permanent total disability plus penalties and attorney’s fees. The defendants appeal contending that if permanent partial disability is allowed, compensation should be computed under the provisions of LSA-R.S. 23 :1221 (4) (o) subject to a dollar-to-dollar credit for compensation benefits previously paid.
The issues are:
(1) What is the extent of plaintiff’s disability ?
(2) Should penalties and attorney’s fees be allowed?
The plaintiff, a farm laborer employed by the Estate of Ovide B. LaCour, was injured on August 21, 1969, when he was accidentally cut across the right hand with a cane knife by a fellow employee. The accident was stipulated to have occurred in the course and scope of his employment.
It was also stipulated that the plaintiff’s compensation rate was $41.83 per week and that St. Paul Fire & Marine had paid a total of 28 weeks of compensation, from August 21, 1969 through March 5, 1970, for a total of $1,171.24. All known medical has been paid with the exception of a bill in the amount of $60.00 for an examination by a Dr. Byron Un-kauf. It was stipulated that this examination was for the purpose of evaluation and preparation for trial. The trial judge correctly disallowed this bill.
The medical evidence in this case included the report of Dr. Harry J. Kellerman, the initial treating physician; the testimony of Dr. Kenneth Cranor, who treated plaintiff extensively following a referral from Dr. Kellerman; and the report of Dr. Byron Unkauf. Mr. Francis Gugliel-mo, a physical therapist, also testified. The only other witness to testify was the plaintiff.
Following the injury plaintiff was treated by Dr. Kellerman of Pointe Coupee Parish. This physician’s report reflects that the accident resulted in a “superficial laceration dorsum (R) hand and severed *309 extensor tendons to the middle finger.” Dr. Kellerman sutured the tendons and the wound. Plaintiff was then referred to Dr. Kenneth C. Cranor, an orthopedic specialist of Baton Rouge.
Dr. Cranor first saw plaintiff on August 22, 1969, two days following the accident, at which time he removed the cast and replaced it with an immobilization apparatus. Dr. Cranor next saw plaintiff on August 29, to check for infection; he did not find such, but on September 12, found that the previously sutured tendon ends had separated approximately one inch due to infection. On September 17, an operation was performed to repair the extensor tendon of the right long finger over the distal third and shaft of the long metacarpal and plaintiff’s right hand was placed in a splint. On October 16, the splint was removed and the plaintiff’s hand was placed in a splint which was flexed, and he was instructed to remove the splint for prescribed exercises. Dr. Cranor at this time noted some adhe-sions in the scar area. His October 24, examination reflected a considerable limitation of motion of the fingers, and on this office visit the splint was removed and exercises prescribed.
On November 14, Dr. Cranor again noted limited motion of the fingers of plaintiff’s right hand, however, he recommended that the plaintiff return to duty, recognizing that ,he could not perform all the duties he had performed before, but felt that by performing “modified” duties that this would be the better course of therapy for plaintiff. At one point, Dr. Cranor stated that the modified or light work program of therapy would substantially alleviate disability within a month or six weeks. (Tr. p. 79) At other times in the testimony the prognosis was indefinite. He stated (Tr. p. 74) that with continued modified use of the hand “then he is apt to increase his actual ability to do this progressively more toward normal. I cannot accurately predict how well, how far toward normal he can return.” (Tr. p. 74.)
Dr. Cranor saw plaintiff a total of 29 times over a course of two years, and was still seeing him at the time of trial. He estimated plaintiff’s disability at that time as follows: 28% to the hand, 25% to the upper extremity, 15% to the man as a whole.
Plaintiff was also examined by Dr. Byron Unkauf, an orthopedic surgeon, on April 6, 1970. His report reveals that plaintiff had a flexor contracture of the second, third, fourth and fifth fingers. “All the extensor tendons appear to be functioning physiologically, but he has a restricted range of movement of all of the joints.” He recommended extensive physiotherapy and probably some appliances to straighten the fingers. He stated plaintiff had a 40 to 50% permanent disability of the hand.
Dr. Cranor referred plaintiff to Mr. Francis Guglielmo for physical therapy. Mr. Guglielmo testified that he rendered plaintiff whirlpool and exercise treatments on 28 occasions, beginning June 18, 1970, and ending July 28, 1970. He stated that plaintiff showed some improvement but still had a limitation of motion in his fingers. He was of the opinion that the best course of therapy for plaintiff was to return to a “modified” type of work in order to integrate himself back into a full use of the hand. The testimony of Dr. Cranor reveals that he apparently was not aware of the plaintiff having actually returned to work for a period of time as he had prescribed.
The plaintiff testified that he had returned to work after Dr. Cranor- advised him to do so. The trial court stated that it had felt that plaintiff’s testimony was “by and large quite honest and sincere.” His testimony concerning his return to work was as follows:
“Q Did you ever try to do any type work with that hand ?
“A Dr. Cranor said that he recommended me to my employee to do—
*310 “Q Your employer?
“A My employee, he wanted me do do exercises in the store, that’s where my employee put me, and I wasn’t able to pick up the boxes and the work that I had to do. I worked and I had three jobs around the plantation. I was a field laborer and I worked in the grocery store at the plantation and I wasn’t able to lift, to grip the things with my hand and pick up what I usually could do, but I had to use my left hand to pick up the heavy, the heavier things, and when I tried to pick up something heavy with this hand I couldn’t hold it, it would fall. When I told Dr. Cranor, every time I’d tell Dr. Cranor how my hand hurt me, he never paid me any mind. So I did the best I could and I never was able to do the regular work that I was doing, that I was able to do before my accident.
“Q Now when Dr. Cranor told you to go back to work, did you go back?
“A I went, I did what Dr. Cranor said. Dr. Cranor told me to tell Mr. La-cour to call him, tell Mr. Ovid La-cour, and Mr. Bubba Lacour to call him, and I did that, and he told me that Dr. Cranor said for me to—
“MR. PHELPS: I object to what some third party told him, May it please the court.
“THE COURT: Sustained.
“Q When you went back to work, you went back to work at Dr. Cranor’s instructions ?
“A I went back at Dr. Cranor’s instructions and they put me in the store.
“Q And could you do that work in the store ?
“A I couldn’t do the work in the store that I could do before my accident.
“Q Did you try?
“A I tried.
“Q What did Mr. Lacour say ?
“A Mr. Lacour, he kept me, he kept me there, and then Mrs. Lacour, the owner of the plantation, they taken me out of the store because I wasn’t able to do the work in the store, and they had me, then her daughter-in-law, Mrs. Vern Lacour, she was the one over the store, she was the one I was working under, and she told me that Mrs. Lacour said she didn’t want to use me in the store.
“MR. PHELPS: I object—
“Q You can’t say what anybody say. Now what happened ?
“A Well, they taken me out of the store and after they taken me out of the store they let me live on the plantation, and I was still being treated by Dr. Cranor. But later on they told me that—
“MR. PHELPS: I object to what—
“THE COURT: Don’t say what somebody told you.”
This objection by the defense counsel ended any testimony pertaining to the reason for the termination of the employment of plaintiff.
Our courts have consistently held: “ . . . that even though a common laborer is not completely incapacitated he may nevertheless be considered as totally and permanently disabled within the meaning of the workmen’s compensation statute if the injury he has sustained has decreased his ability to compete with able-bodied workers in the flexible general labor market.” Stephney v. Robertson, 219 So.2d 9 (La.App. 4th Cir. 1969).
In the case of Hebert v. South Louisiana Contractors, Inc., 238 So.2d 756 (La.App. 1st Cir. 1970), this Court held as follows:
“We have been made aware of the jurisprudence which, in accordance with the *311 circumstances presented, has permitted recovery by an injured laborer only for temporary partial disability or permanent partial disability. But in our opinion, from all of the evidence and the absence of any indication of malingering on the part of plaintiff, we should apply and follow the rationale expressed in the following quotation from Easterling v. Employers Liability, La.App., 203 So.2d 852 at p. 855:
* * * we see that plaintiff was a common laborer whose duties involved heavy lifting and other tasks requiring physical strength. Thus there could be no doubt that plaintiff would be substantially handicapped in competing with other able-bodied workers in the regular common labor market, and therefore totally disabled within the meaning of the Louisiana Workmen’s Compensation Act. Young v. Southern Casualty Insurance Company, 188 So. 2d 437 (La.App. 3d 1966); Thomas v. Gates, Inc., 157 So.2d 263 (La.App. 3d Cir. 1963).’””
The defendant argues that the trial court erred in awarding plaintiff permanent partial disability under the general disability provisions of LSA-R.S. 23:1221(3), but should have awarded compensation for loss of a function of a limb under LSA-R.S. 23:1221 (4) (o).
We disagree. It is well settled that “whenever the worker can show that he was wholly or partially disabled he is entitled to compensation for the period provided in the disability provisions of the act, even though his disability arose from one of the specific losses set forth in the schedule.” Malone, Louisiana Workmen’s Compensation Law and Practice (1951) Section 279, p. 352. See. also Papillion v. Employers Liability Assurance Corporation, 146 So.2d 448 (La.App.3rd Cir. 1962) ; Murry v. Southern Pulpwood Insurance Company, 136 So.2d 165 (La.App.3rd Cir. 1961).
This is in agreement with our holding in Hamilton v. New Amsterdam Casualty Company, 208 So.2d 158, wherein this court held: “. . . that when a worker cannot perform the substantial duties of his former occupation or can only perform them in substantial pain, such a worker is totally and permanently disabled for workmen’s compensation purposes irrespective of the medical • percentage of the loss of use of the affected member.”
The medical evidence clearly preponderates that plaintiff was unable to perform his usual duties as a farm laborer. The plaintiff did return to work as advised but to no avail. The plaintiff, two years after the accident, following extensive medical treatment, physical therapy, and light work for a while, still suffered the disability of 20% to the body as a whole. There is no doubt that plaintiff would be substantially handicapped in competing with able-bodied workers in the regular common labor market. We conclude that plaintiff is permanently and totally disabled.
We turn next to the question of whether penalties and attorney’s fees should be awarded. We have concluded that the trial court was in error in disallowing penalties and attorney’s fees.
The defendant argues that an insurer placing reliance on the medical report of the treating physician to the effect that claimant can return to work, is not liable to claimant for penalties and attorney's fees for discontinuing compensation payments pending litigation, and cites several cases in support thereof. While we have no quarrel with the cases cited by the defendant, we do not believe that they are applicable to the facts of this case.
The defendant terminated compensation on March 5, 1970. This was apparently done in reliance on Dr. Cranor’s last report of December 17, 1969. However, while Dr. Cranor did state that he thought *312 it would be advantageous for the plaintiff to return to work from a “therapeutic” standpoint, he further stated that he could not determine the extent of permanent impairment at that time. The fact that payments were made subsequent to this report reflects that the defendants did not consider the plaintiff to be fully recovered.
As pointed out previously, the plaintiff did attempt to return to work as suggested by Dr. Cranor, but was unable to perform even the light duties he was assigned. Again, as previously pointed out, when plaintiff was asked if he quit or was dismissed an objection was made to his answer, which objection was sustained, therefore, the record is silent on this point. No testimony was presented by defendant as to the reason for the termination of plaintiff’s employment. We, therefore, can only conclude that the employer terminated the employment. See, Stephney v. Robertson, supra, where a similar situation was presented, and the court held that penalties and attorney’s fees were due.
The entire tenor of defendant’s brief and oral argument before this court was not that plaintiff was not due compensation, but rather that he was only due compensation for a loss of a function of a limb under LSA-R.S. 23:1221 (4) (o).
Under these circumstances we feel that this case falls squarely under the holdings of Stephney v. Robertson, supra, and Fruge v. Pacific Employers Insurance Co., 226 La. 530, 76 So.2d 719 (1954), which case was previously before this court, wherein our Supreme Court held:
“We can concede that defendant may have been in good faith in refusing to pay plaintiff compensation for total and permanent disability on the ground that . there existed no bona fide dispute between them as to plaintiff’s partial disability, and thus defendant could not have been in good faith when it discontinued all compensation payments on March 30, 1953. In view of the fact that the dispute between plaintiff and defendant was merely over the extent of plaintiff’s disability, there was no justification for this discontinuance of all compensation on March 30, 1953, and we, like the Court of Appeal, can only conclude that defendant’s failure to pay compensation was arbitrary, capricious, and without probable cause, and that defendant is therefore subject to the penalties provided in R.S. 22:658, as amended by Act. No. 417 of 1952.
“If instead of cutting off all compensation payments the defendant had tendered to the plaintiff an amount which it thought to be due for partial disability, our decision in this case might be different . . . ”
See also Wright v. National Surety Corporation, 221 La. 486, 59 So.2d 695.
We therefore conclude that the termination of payment was without probable cause and that the defendant’s are liable for attorney’s fees and interest, and we further conclude that within the contemplation of LSA-R.S. 22:658 reasonable attorney’s fees should be $2,500.00.
For the reasons stated above:
It is ordered, adjudged and decreed that the judgment appealed from be amended and recast so as to provide that plaintiff have judgment against the defendants, in solido, for workmen’s compensation payments at the rate of $41.83 per week commencing August 21, 1969, during disability but not to exceed 500 weeks (subject to a credit of 28 weeks of compensation paid) with legal interest on all past due weekly installments as provided by law, plus a penalty of 12% as provided by LSA-R.S. 22:658 and $2,500.00 attorney’s fees; and for any additional medical expenses incurred by plaintiff, not exceeding the amount fixed by law. All costs of this appeal to be paid by defendants.
Amended and rendered.